IN BANC.
Proceeding in the matter of the estate of Thomas Henry Edwards, deceased, instituted by Martha Virginia Edwards Earle against the Security Savings Trust Company of Portland, and others for the purpose of setting aside the will of said decedent. From a decree sustaining the will, contestant appeals.
AFFIRMED. REHEARING DENIED.
This is a controversy concerning the validity of the alleged will of Thomas Henry Edwards, executed February 21, 1929, in Portland, Oregon. *Page 596 
Edwards died September 16, 1929, in San Diego, California, aged 59 years. The will was presented for probate in common form to the circuit court (probate department) of Multnomah county, and was so admitted September 20, 1929. On September 15, 1930, Virginia Edwards Earle, then 25 years of age, the only child and sole heir of the deceased, instituted this proceeding for the purpose of setting aside the said will upon charges of fraud, undue influence and lack of testamentary capacity. The proponents of the will, after denying all of these charges, sought an order to have the will probated in solemn form. After an extended trial, the circuit court entered an order sustaining the will. The daughter appealed.
It is the contention of the contestant that on February 21, 1929, when Edwards prepared and executed his will, he either lacked testamentary capacity or was so mentally weak that he could not withstand the alleged wrongful conduct of Mary Edwards Longo, his sister, and Adolph G. Sieberts, an employee of the deceased. The contestant alleges that this wrongful conduct consisted of falsely representing to Edwards that the contestant no longer loved her father, that she had gone out of his life, and that the two individuals just mentioned were deserving of his bounty. She alleges that as a result of their improper actions Edwards inserted in his will provisions in their favor, and granted her a bequest of only $100 out of an estate which he deemed of a value of $460,000.
Let us first endeavor to gain an impression of Edwards during the years when his mental capacity was not questioned. He was born in Portland September 14, 1871, of Welsh and Irish parentage. His father, who had founded a retail furniture corporation, entitled *Page 597 
the Edwards Company, is described by the evidence as a stubborn, determined, positive character. The son evidently inherited these qualities from his father, for many of the witnesses commented upon his strong will, his positive nature, his determination, and upon the futility of attempting to argue him out of his opinions. Mrs. Edwards, who divorced him August 31, 1927, testified: "He was very strong-minded, and I always let him have his way — his wish." Again she testified: "He was very positive * * * I couldn't change him." The daughter testified: "Father was very determined; when he made up his mind, it was certainly hard to change it for him. I don't know that I could say anyone ever changed his mind for him." His determination was born of his philosophy of life and the latter caused him to coin the maxim, "Never be doubtful, apologetic or fearful," which he commended to his daughter as a suitable maxim for her own guidance through life. Edwards never engaged in arguments. When anyone showed a disposition to want to argue with him he quietly walked away. When anyone over whom he possessed control opposed him he quickly terminated the situation by severing the relationship. While he was a man of strong likes and dislikes, he rarely gave evidence of his dislikes, and this element of his nature caused him to refrain from speaking ill concerning anyone.
Edwards was a well-educated man. The learning which he had acquired in a Montreal parochial institution and in Rensselaer Polytechnic Institute had been greatly augmented by constant reading. He was able to converse intelligently upon a variety of subjects and was wont to back up his statements by naming an authority or quoting from some favorite writer. *Page 598 
He always sought to excel, whether he was engaged in card playing, tennis playing, or business. He urged his daughter from her early youth to put her mind in working order and told her that when she had accomplished this difficult feat few people would be as fortunate as she, for, he said, "the satisfaction of doing things that other people cannot do is worth a lot." Edwards was more than a mere reader, he was a thinker. He declared, "I have found that if you want your thinking done by someone else you are going to be poor." Those who came into contact with him regarded him as a quiet, reserved, intelligent, well-informed business man.
Upon the death of Edwards' father, in December, 1913, Edwards inherited one-half of the corporate stock of the Edwards Company. A few years later he purchased the other half from his sister who was then Mary Edwards, and thereafter remained in the ownership of virtually all of the corporate stock until his death. In 1922 he began to spend much of his time in California. Until that year his daily routine brought him to his office in the store at approximately 8:00 a.m. where he remained until 10:00 a.m. He then disappeared and did not return until a few minutes before 5:00 p.m. The intervening hours he spent in athletics, conferences or reading. His theory was that an executive should not confine himself too closely to details. Beginning with 1922 he spent most of his time in California and operated his store through hired employees. His method of operation through the years proved so successful that, although stock in the company was worth only $50 a share when Edwards came into control, December, 1913, it was worth more than $250 a share at the time of his death. In the *Page 599 
meantime, the company had earned for Edwards a net profit of more than a half million dollars cash. Thus, this man's intellect and his ability to judge men had devised a plan where, largely through absentee management, he had been able to cope with his competitors and cause his business to prosper greatly.
In 1922 when Edwards went to California he sent the contestant, to whom we shall hereafter refer as Virginia, to Dana Hall, an educational institution in Massachusetts. She had previously graduated from St. Helen's Hall in Portland, and prior to that had had the benefit of a year's schooling in California. A year after entering Dana Hall she matriculated at Wellesley College. In 1927 she graduated from the latter institution. Each summer, while attending these institutions, she returned to the west coast where she was met by her father in California, and after spending some time in recreation, came north with him to the home in Portland. Edwards was exceptionally fond of his daughter, and one witness said he adored her.
During Virginia's stay in the east Edwards wrote her numerous letters. Several of these are in the record as exhibits. We have admired their beautiful literary style and have been impressed with the wholesome philosophy of life which the father endeavored to impart to his daughter in these letters. Virginia, in tribute to them, testified that she believed that no other girl had ever received from her father such a wonderful series of letters. In several of these he commended to his daughter's serious consideration marriage soon after graduation. He sought to point out to her how to choose a satisfactory husband, and declared that a woman's greatest happiness in life came from her children. He wrote to her, "Love is a *Page 600 
fever of youth, but a companion for the days of earthly existence is the real object of marriage." He urged her to so prepare herself that she would be a valuable helpmate for some good man.
While Edwards was in California, and up to the hour when he suffered the stroke of apoplexy that terminated his life, he wrote numerous letters to the manager of his store and to others in regard to his property and other business matters. All of these letters are terse, decisive, and reveal clear thinking.
We have now reached the year 1927, being the year in which Virginia graduated from Wellesley College, and have gained an impression of Edwards' characteristics, as well as an impression of his attitude towards Virginia. We shall mention one more item — Edwards had a hobby for drafting wills. Up to the month of September, 1926, he had executed seven such instruments. Since his estate was large, his beneficiaries many in number, and, since he always resorted to a trust so as to take the management of his estate out of the control of his wife, in whose business judgment he reposed no confidence, these wills were quite complex in their structure.
In and about the year of 1927 many events had their inception which we shall now mention because of their bearing upon the main event with which we are concerned — the preparation of the will of February 21, 1929.
Edwards' married life had never been happy. Seemingly, he found but little in Mrs. Edwards worthy of his admiration, and, since his nature was one which caused him to refrain from speaking ill concerning others, it is surprising to find that so frequently words *Page 601 
of criticism escaped him concerning Mrs. Edwards. In 1926 he began to urge his wife to obtain a divorce from him. She later filed a suit for divorce in the California courts and obtained an interlocutory decree August 31, 1927, and a final one September 22, 1928.
In February, 1926, he met in San Diego one Frances E. Murray, then 27 years old. Soon thereafter she sustained a relationship towards him which he termed that of a housekeeper. She claimed that the two had exchanged promises looking towards marriage. Edwards paid her a very substantial salary month by month for her services. In fact, the monthly wage was so great that it indicates that he rewarded something more than mere housekeeping service. Evidently Edwards received much companionship and pleasure from the presence of Mrs. Murray, but our conception of her can best be conveyed by use of the word "adventuress."
Approximately at the same time when Mrs. Edwards instituted her suit for divorce an attorney representing her began to negotiate with Edwards for a property settlement. March 9, 1927, an agreement was reached and the parties thereupon executed a written instrument contemplating a settlement of their property rights. Their agreement provided that Edwards should deposit with the Security Savings Trust Company of Portland $90,000 in securities, the income from which should be distributed by paying Mrs. Edwards the sum of $300 per month during her lifetime, and Virginia the further sum of $100 per month. Upon the death of Mrs. Edwards the entire income was payable to Virginia. The latter was given control over the fund to the extent of permitting her to devise the res upon the death of the two. May 19, *Page 602 
1927, Edwards deposited with the trustee a large quantity of securities, but the trust did not become effective until November 1, 1928.
About the time when Mrs. Edwards obtained her decree of divorce the Edwards disposed of their Portland home, and he thereafter lived in apartments in San Diego and Portland, while Mrs. Edwards either traveled in the eastern states with Virginia or lived in an apartment in Los Angeles.
In 1927, as we have previously stated, Virginia graduated from Wellesley College and then came west for a visit with her parents. She testified that during this visit she told Mr. Edwards that she had become interested in a young Harvard College student, named Herbert Earle. She swore that she informed her father that they contemplated marriage some time in 1928. She also testified that she exacted from her father a promise that he would attend the wedding which she anticipated would be held on the west coast. However, since in another portion of her testimony she stated that she had not definitely accepted Mr. Earle's offer of marriage until shortly before the ceremony was held, she could not have spoken to her father in 1927 of the contemplated marriage as an assured event. The evidence indicates that Mr. Edwards did not understand that the wedding would occur for about two years. In the fall of 1927 Virginia returned to the East with her mother for the announced purpose of engaging in further study. Virginia testified that when she spoke to her father concerning her above plans he approved the contemplated marriage.
March 14, 1928, the wedding was held. At that time Mr. Earle was a special student at Harvard College. He should have graduated in 1927 when Virginia *Page 603 
did, but failed. He was now endeavoring, with the assistance of tutors, to qualify himself for admission into Harvard Law School. In order to be able to take care of Virginia, Mr. Earle effected an arrangement with his parents whereby they agreed to send him $300 a month until he should have achieved an earning capacity. This arrangement terminated a few months afterwards when the Earle family met with financial reverses. Edwards learned of the contemplated marriage and wrote Virginia a letter in which he expressed disapproval and withdrew his promise to attend the wedding. The reasons for his disapproval he clearly expressed in his letters and in conversation with two or three of his intimate friends. He disliked to see Virginia marry one who had not proven his worth. Mr. Earle, in an endeavor to reconcile Mr. Edwards to the marriage, wrote him a letter and received the following reply, dated April 3, 1928:
"Dear Mr. Earle:
"In reply to your letter, my opinion of the proposed marriage is as follows:
"The old-fashioned idea to which I hold is, that a man who has yet to demonstrate his ability to make his way in the world is not a desirable mate for an American young woman. He does not necessarily face a future of failure, but he does face a percentage in that respect, which should cause any parent with ordinary business judgment, to give warning to his daughter.
"It is known that such warnings are futile, and one who points out the truth is less well thought of when the truth does not fit the daughter's proposed plans.
"The man who gambles in business, and the woman who gambles in marriage, are in the same category. The world is full of people who prefer to `take a chance' in the place of thinking, and they mostly wind up as a `hard luck story.' *Page 604 
"Only recently have I found out how little higher education does to promote real ability to think correctly, so in my daughter's case I can only hope, and wish her good luck.
"Yours very sincerely,
"T.H. Edwards."
Unknown to Edwards the marriage had already taken place when the foregoing letter was written. The wedding announcement stated that the ceremony had been held May 14, 1928, and when Edwards died he still remained unaware that the wedding had actually taken place in February.
So strong was Edwards' opposition to the marriage that he not only refused to attend the wedding, and refused to meet Mr. Earle's parents when they took a trip to the west coast, but also refused to send a wedding present until his sister, Mrs. Longo, after much persuasion, convinced him that his failure to send a present would cause Virginia great embarrassment. He now refrained from writing to Virginia any further. Upon her visit to him in December, 1928, he told her that she would have done better to have married an iceman than this young man of unproven worth. To Mrs. Murray he described Mr. Earle as a numbskull. In the examinations following the marriage Mr. Earle again failed, but, finally, after applying to the University of Michigan Law School where he was able to gain special admission, transferred to the Harvard Law School, and, should he succeed in passing his various examinations, will graduate in 1933, five years after the marriage.
In September, 1927, and January, 1928, Mr. Edwards executed two more wills, both of which contained generous bequests for Virginia. *Page 605 
Let us now consider the condition of Mr. Edwards' health in this period of time. Edwards had been a firm believer in the beneficent effect of exercise and diet. He spent much time in swimming, playing tennis and handball. He was a frequent visitor at the seashore. These habits which he had acquired in his youth he retained to the end, and shortly before death overtook him he sent to a tennis association his check for his dues for the ensuing year. Tennis had been so dear to Edwards' heart that after his death some of his relatives became embroiled in a controversy of considerable proportions concerning one of his favorite racquets. He read many books on diet, and diet became one of his principal hobbies. He experimented with different items of food and in order to insure himself of a better understanding of their effects upon his system installed in his apartment a blood pressure testing machine. What he believed was good for himself he eagerly commended to others. Thus, he encouraged his employees to join athletic clubs, and assisted them by paying one-half of their membership fees. He also presented to his friends favorite books upon diet. He subscribed to the belief that ill health was one's own fault and carried this theory into effect by refusing to pay his employees wages during periods of their ill health, although he was extremely generous with them in many other ways.
According to Virginia, her mother and Mrs. Murray, Mr. Edwards' health began to show signs of failing in the year 1926. In that and subsequent years, according to the testimony of these witnesses, Edwards showed irritability and impatience at times. In the fall of 1928 he suffered an attack of what he termed "the *Page 606 
flu" and in the course of his illness lost several pounds in weight.
Some time in 1928 Edwards apparently became convinced that he was in need of a medical examination. Accordingly, we find that November 8 to 24, 1928, he consulted for treatment an osteopathic physician, named Dr. J.D. Cunningham. November 22, 1928, April 17, 1929, and August 6, 1929, he received treatment and examinations from Dr. A.D. Butterfield. March 14, 1929, Dr. Frederick A. Speik, a diagnostician of Los Angeles, gave Edwards an examination, and February 20, 1929, Dr. Robert D. Forbes of Seattle gave him a cursory examination and advice. In October of 1928, and continuing until the time of his death, Edwards was receiving treatment from a male nurse in San Diego, named T.F. Patton — treatment of a kind which he testified was afforded in the Battle Creek Sanitarium.
It is very evident that Edwards had but slight confidence in physicians, and a circumstance which confirmed him in his ill opinion of them was the fact that their recommendations of what was needed to bring about recovery did not harmonize.
Let us now review the testimony of these physicians concerning Edwards' condition. Dr. Speik is a physician specializing in internal medicine. After having given Edwards an examination he persuaded him, against his will, to go to a hospital. After having stayed at the hospital for one night, and having evidently concluded that he would be subjected to an operation, he expressed to the nurse in charge a desire to leave. When his clothes were returned to him he left, after having arranged for payment of the hospital *Page 607 
charges. Later, Dr. Speik, in response to Edwards' request, sent him a full statement of his (Dr. Speik's) findings. A copy follows:
"Los Angeles, Calif., March 29, 1929.
Dear Mr. Edwards:
Your favor of March 26th is here, for which I thank you.
The following are the laboratory tests, X-ray reports, etc., of my recent examination of you:
Urinalysis —
Sp. gr. 1004. Acid. Trace of albumen, negative for sugar and casts, small amount of pus. Moderate amount of epithelial cells.
Blood —
R.B.C. 2,400,000. Leucocytes 8,800. Hemo. 40 per cent (Dare) Red cells thin — variation in size and shape. No abnormal reds seen.
Blood Chemistry —
 Urea ....... 24 1/2 mg. Creat. ..... 3 mg. Sugar ...... 87 — mg. U. Nit. .... 11 1/4 mg.
Wasserman —
Negative.
X-Ray —
6-foot film of the chest shows a great deal of enlargement of the heart. There was a slight amount of haziness in both costa-diaphragmatic angles. There was also a slight increase in the hylus densities and the pari-bronchial markings.
Findings —
Enlargement of the heart; — probably some stasis in the lungs.
Physical Findings —
Pulse 90. Blood pressure 180-85.
Diagnosis —
Probable cancer of prostate. Secondary anaemia. Urinary retention. Vascular hypertension. Beginning anasarca. *Page 608 
You really are a pretty sick man and I trust you will seek further medical advice. I feel sure I could have helped you had you remained under my care.
Very truly yours,
F.A. Speik."
In addition to exhibiting this report, Dr. Speik testified that he found Edwards "a very sick man"; that he had "fluid in his abdomen" and an "enlarged prostate." He also testified that Edwards' feet and ankles were swollen and that his breath was short. Although Dr. Speik, before consulting his office records, had testified that Edwards had chronic nephritis, an ailment of the kidneys which precedes chronic uremia, he withdrew that statement after he had consulted his office records. He then testified: "The reaction was acid, a trace of albumen, no sugar and no casts, indicating no chronic nephritis." Dr. Speik testified that Edwards' swollen prostate gland prevented a normal emptying of the bladder and thus produced urinary retention. He was of the opinion that such a condition would affect the functioning of the mind. In a case like Edwards, he felt that the effect would operate against the exercise of sound judgment and cause the individual to reach unreasonable conclusions. He had not known Edwards before this visit and never saw him thereafter. Dr. Speik freely conceded that Edwards answered all of his questions intelligently and without difficulty. He added that Edwards knew what he was talking about. Dr. Speik seemed annoyed when Edwards left the hospital and seemed to feel that his failure to remain there for an operation was evidence of mental impairment. He conceded, however, that this was the only error which Edwards had committed within his observation. Dr. Butterfield made *Page 609 
a cursory examination of Edwards November 22, 1928, but "a more complete" one April 17, 1929. He found urinary retention and testified that such a condition makes the individual irritable, less acute mentally and that as it progresses the victim enters a condition of coma. He also found Edwards subject to a secondary anaemia which, he testified, would be likely to render Edwards less alert and less capable of exercising good judgment. According to his testimony, Edwards was slow of speech and of thought. We quote the following excerpts from Dr. Butterfield's testimony: "I don't think he was insane * * * I consider the man was developing toward uremia * * * he was rational." He added that Edwards was capable of thinking straight but was slow in making decisions, but that, having made a decision, he knew what he was doing. He also conceded that Edwards was capable of transacting ordinary business and that he talked coherently and logically. Dr. Cunningham, the osteopathic physician, treated Edwards for an enlarged prostate and for kidney and liver troubles. Apparently he and Edwards irritated one another, and evidently neither secured a favorable impression of the other. He testified: "He impressed me as suspicious of everyone — thought they were trying to do him. * * * He was irritable and very quick to say it didn't please him. * * * He was very decided." He did not notice any derangement in Edwards' mind but thought that at times Edwards was not himself. He found Edwards to be in moods which caused him at times to refrain from talking, while at other times he was more inclined towards conversation. Dr. Cunningham testified that an illness of the type with which he thought Edwards was afflicted would affect the clearness of a victim's mind, but that it never had occurred to him *Page 610 
that Edwards was demented. Dr. Forbes, a Seattle physician who bears an excellent reputation for skill, made nothing more than a cursory examination, but found nothing which suggested mental impairment. We come now to those physicians who had not known Mr. Edwards but who were called as experts to answer hypothetical questions. Dr. F.H. Dammasch of Portland, in the course of his testimony, recited a number of manifestations of chronic uremia scarcely any of which had been observed present in Edwards by his numerous acquaintances who testified. Dr. Dammasch testified that uremia is the result of chronic nephritis, and yet, as will be observed from Dr. Speik's testimony, Edwards was not afflicted with that ailment. He also assumed that Edwards had general arteriosclerosis, secondary anaemia, general anasarca and chronic uremia. By turning to Dr. Speik's report it will be observed that he makes no mention of general arteriosclerosis and general anasarca. We reject this witness's opinion that Edwards' mind was impaired, and that he was an easy object of influence as ill founded. Dr. D.C. Burkes, another medical expert, called by the contestant, testified that Edwards did not have "a true or a frank psychosis, that is, true insanity." Again, he testified: "I didn't say that there was a mental impairment. I said there could most likely be, and that an anaemic brain would not function in its normal manner." We quote further: "I don't think the man was truly insane; that he was mentally incompetent * * * but I think the man was sick, his brain was tired." We quote further: "I think Mr. Edwards knew what he was doing when he made his will"; but modified this statement by adding that Edwards was sick and was laboring under emotional distress. Manifestly, since the witness had never *Page 611 
known Edwards, the latter remark was without foundation in fact. He also testified that Edwards' mind was fully capable of understanding his various pieces of property and of contemplating those who were entitled to his bounty. As the examination progressed the witness was shown various of Edwards' letters and, when pressed for a declaration concerning the mental qualities which would enable an individual to write such instruments, declared: "I have never questioned Mr. Edwards' business ability." His testimony indicates strongly that in arriving at his conclusions he assumed that Edwards was suffering from hardened arteries of the brain and that Edwards' failure to make a more generous bequest to his daughter in his will was an item of great magnitude. After being questioned at some length concerning the basis for his conclusion that Edwards was not mentally himself when he prepared his will, he declared: "That is my opinion, my unqualified opinion, and I still believe it, and I shall continue to believe it in the face of facts." Which confirms the opinion ofttimes held concerning expert witnesses, that even facts do not change their opinions.
Virtually all of the witnesses whom we have mentioned freely conceded that some individuals withstand the progress of a disease more successfully than others, and that one with a high resistive power will be capable of retaining his mental powers unimpaired where another with a less positive nature would display evidence of mental impairment. These witnesses, or at least a part of them, conceded that secondary anaemia affects the quantity but not the quality of the victim's work. Dr. A.E. Mackay, a Portland physician who specializes in urology, that is, diseases of the kidneys *Page 612 
and bladder, testified that he yearly treats more than 100 patients suffering from prostatic ailments. We quote from his testimony:
"Q. What is your experience, Dr. Mackay, with reference to prostatic troubles as a cause of mental disorders and mental impairment? A. Well, it is very, very seldom that I meet an old prostatic, even an advanced age prostatic, unless they are extremely uremic, that I find they are not quite capable of doing their business and carrying on business, and being quite bright brained.
"Q. What do you mean by `extremely advanced?' A. Where they are confined to their bed, where they are dull brained, do not answer questions intelligently, and are very, very sick.
"Q. Now, does the urea content of the blood have any effect on mental impairment? A. Not unless it would be very high, showing profound toxemia.
"Q. What do you mean by `very high?' A. Of what?
"Q. Very high urea content; what would you call a very high urea content? A. Well, the urea content would have to be, oh, possibly 35 or 40. I pay more attention to the urea nitrogen in laboratory tests.
"Q. What would have to be the count, or what would have to be the urea nitrogen content before you would say it would have any effect on the mind? A. That would have to be 20, 25, 30; a high urea nitrogen test.
"Q. If a man has a normal urea nitrogen content, would that have any effect on his mind? A. No.
"Q. Now, what is your experience with reference to high blood pressure and mental impairment? Is there any connection between the two? A. Not that I ever found out; most of these old prostatics have high blood pressure.
"Q. Now, what is the normal content of urea nitrogen in the blood? A. Oh, 12 to 15 milligrams per C.C.
"Q. If it should be shown that the patient whom we have been discussing had a urea nitrogen content of 11 and a half milligrams, what would you say? A. That would be within easy normal limits. *Page 613 
"Q. Easy normal limits? A. Yes; nothing out of the way.
"Q. Is there anything else in this statement of symptoms which we have given you which would, in your opinion, affect his red cell count, beside the diet and the urinary retention? A. No, not particularly, except his prostatic condition.
"Q. Now, taking up the urine test; among the symptoms we gave you, it was determined — it was shown, rather, that the reaction of the urine was acid; is that normal or otherwise? A. Well, that — urine usually is normally acid."
Dr. George A. Cathey, who confines his practice to brain and neurological surgery, testified:
"Q. Now, what is the normal amount of urea nitrogen? A. It runs from 10 to 15 — 10 to 13; it varies.
"Q. Then, if it develops that Mr. Edwards' urea nitrogen from a blood analysis was eleven and a half, would you say that was within the normal area? A. Yes, sir.
"Q. Well, then, based upon your analysis of Doctor Speik's blood analysis, in turn, what conclusion do you draw as to the possibility of Edwards having suffered from chronic uremia? A. It is absolutely inconsistent, because a person would not have uremia of any form without a retention in the blood of a high increase of urea, and it will go up as high as a hundred of urea in the blood before a person will show any signs of uremia; and in the definite signs of uremia, it goes as high as 150, and in the marked type it is as high as three, per cubic centimeter of blood.
"Q. As against twenty-four and a half in Mr. Edwards' blood analysis? A. Yes, sir."
Both Dr. Mackay and Dr. Cathey, after being shown Dr. Speik's report, testified that nothing contained within it indicated that Mr. Edwards' mental qualities were impaired. *Page 614 
The only witness who testified directly that Edwards was afflicted with uremic poisoning was the aforementioned T.F. Patton, a male nurse, who operates a sanitarium in San Diego to which Edwards had resorted for treatment. He was not a physician and Dr. Butterfield, under whom Patton had secured his training, testified that Patton was not qualified to express an opinion upon such a complex problem. Patton, however, stated that while Edwards' illness made him "dopey" or "drowsy" at times it did not impair his mind, and that Edwards was at all times alert, intelligent, positive and interesting in conversation. He testified that he had advised with Edwards in regard to investments and the development of his own sanitarium. He protested emphatically that he had observed nothing about Edwards indicating mental impairment, although he had come in contact with Edwards almost daily for approximately a year's time. He also declared that his treatments whereby Edwards was relieved of his urinary retention greatly benefited Edwards and that this benefit was particularly manifest in April, 1929, and the following months.
From the foregoing we believe it is manifest that Edwards was not afflicted with chronic nephritis nor with chronic uremia. Yet those two alleged ailments are, to a substantial extent, the very foundation of the contestant's attack upon Edwards' mental capacity. It will also be observed that Dr. Speik's report makes no mention of general arteriosclerosis, nor of general anasarca. As a witness, Dr. Speik left the impression that possibly Edwards was suffering from a "wet brain." More than one of the medical witnesses testified that no examining physician would permit a wet brain to remain a matter of doubt, for medical instruments are capable of proving or disproving conclusively *Page 615 
such a condition in a patient. Witnesses also testified that no one could live for several months with a wet brain. Hence, we cast out this supposed ailment as one that Edwards did not possess. Mrs. Murray testified that in the latter part of 1928 Edwards was severely bloated, and that this condition was so serious in his legs that his trouser legs, although large, in conformity to the prevailing style, were completely filled. This is the young woman who was serving Edwards as housekeeper, under a salary arrangement much larger than that ordinarily paid for such services. The transcript of evidence indicates that she frequently hesitated while under examination and more than 200 times replied that she could not remember. Immediately following Edwards' death she abandoned the mourners and hurried to a safety deposit vault where she made a search for his will. Later, when others had found that instrument and Mrs. Murray had read it, she was grievously disappointed with her bequest, and, in a spasm of hysterics, burst into tears, protesting that she would never again do anything for any man. Before testifying for the contestant she exacted a written promise that, in the event the contestant prevailed, she would receive everything granted to her by the will. These circumstances seriously discredit this witness, in our estimation, and our ill opinion of her is confirmed by an item of evidence which we now shall mention. In November, 1928, when Mrs. Murray claims that Edwards' body was badly swollen with fluids and his trouser legs filled from the ill effects of a dropsical condition, she and some friends took several photographs of Edwards. She also mentioned him in a letter. Neither the letter nor the photographs support her present claim. To the contrary the photographs represent a man with keen eyes, erect, and apparently *Page 616 
physically fit. This she admitted by writing on the reverse side of one, "Isn't this just like Mr. Edwards?" before mailing it to one of Edwards' relatives. No swelling nor crowded trouser legs are indicated in any of these photographs.
Without reviewing further the aforementioned portion of the evidence, we state our opinion that the medical testimony indicates that Edwards was afflicted with an enlarged prostate gland, beginning anasarca, secondary anaemia, and some hardening of the arteries. It also indicates that his condition might diminish the quantity of his work, physical or mental, but not the quality. We pause to take note of the fact that in December, 1928, when his condition was supposedly at its worst, he drove alone his automobile from San Diego to Los Angeles in the early hours of the morning and met with no difficulties.
We come now to approximately 80 witnesses who saw Edwards in the latter part of 1928 and during the nine months of 1929 which preceded his death. These witnesses testified to the extent of their acquaintanceship with him and their observations concerning his mental capacity. We shall review briefly the testimony of a few of these. T.O. Bird is a Portland real estate agent who, in 1928-1929, was conducting negotiations for the sale of a valuable piece of Portland property owned by Edwards. He saw Edwards in February, 1929, and noticed no evidence of mental impairment. To the contrary, he was impressed with the manner in which Edwards analyzed the proposed transaction. B.H. Bowe, the subscribing witness to Edwards' will, saw no evidence of mental derangement. J. King Bryon, the managing director of the Furniture Dealers Association, conferred with Edwards in February, 1929, concerning bills pending in the Oregon legislature. *Page 617 
He was impressed with Edwards' grasp of the situation and saw no change in the keen, analytical mind which he had always noticed that Edwards possessed. Blain B. Coles, vice president of the Security Savings Trust Company, received in February, 1929, delivery of Edwards' will. He saw no change in Edwards' condition. He, together with many other of the witnesses, believed that Edwards' ability was above the average. Bessie F. Colwell was the public stenographer to whom Edwards dictated, unassisted, the will which we shall later quote. She testified that he "dictated in a very calm, efficient way" and that he "dictated especially well." She had known Edwards for many years and found him in February, 1929, as "sound in mind as you or I." Frederick W. Davis had been an intimate friend of Edwards for 25 years, and at the time in question was one of the employees of the store, but not a beneficiary under the will. He saw Edwards both in February, 1929, and in June, 1929, and testified: "I never found any difference in his mental condition," which he declared was always excellent. Charles E. Dye, vice president of the Furniture Corporation of America, and an old friend of Edwards, held an extended conversation with him in February, 1929, concerning a merger of the leading retail furniture stores of the west coast. Since he found Edwards' mind as bright then as ever before, the witness declared: "I did not think of his mental condition; it did not occur to me." We have already mentioned Dr. Robert D. Forbes of Seattle. He testified that Edwards "had a very keen mind * * * showed a mental alertness and a very quick understanding." He saw no suggestion of mental impairment. B. Gildner, an extensive owner of Portland property, and a friend of Edwards for 40 years, saw him in 1929 and played *Page 618 
cards with him several times upon that visit of Edwards to Portland. Edwards' card playing ability which, in the witness' estimation, was always excellent had suffered no impairment, nor had his mind. Homer Goehler, secretary of the Powers Furniture Company of Portland, discussed with Edwards February, 1929, the proposed furniture merger previously mentioned. He found Edwards "the same as he always was, very keen." He discovered no indications of mental impairment. Harry A. Green, president of the Doernbecher Furniture Company, discussed with Edwards, in company with the aforementioned Clark E. Dye, the contemplated furniture merger. He swore: "His mind was just as keen as it always had been" and described Edwards' conversation thus: "Conversation was exceptionally intelligent along business lines." Herbert Greenland, a Portland tailor, who had known Edwards for 35 years, made a suit for him upon his visit to Portland in February, 1929. He saw no change in Edwards' mind which he described as "above the average." Charles S. Hall, an employee of a San Diego Public Service Company, saw Edwards frequently in 1929 and found him an especially capable card player. He had no doubt of Edwards' mental capacity. Earl Hamilton, an employee of the Edwards Company since 1922, saw Edwards in February, 1929, and noticed no indications of mental impairment. Edgar O. Hodge, vice president of a San Diego bank, knew Edwards for approximately five years and saw him in December, 1928, and also in 1929. In the latter year Edwards borrowed at Hodge's bank several sums of money, including one item of $18,000. The witness knew of no indications of mental impairment. Harry W. Johnson, an employee of the Edwards Company, who was not a beneficiary under the will, met Edwards *Page 619 
in February, 1929, and, at his request, installed a radio receiving set in his apartment. He saw no change in the keenness of Edwards' mind. A.E. Kern, a Portland printer, who had known Edwards for 40 years, conversed with him several times in February, 1929, and again in June, 1929. The two discussed a wide variety of subjects, including wills, the handling of employees, financial investments, trust, and business conditions. Mr. Kern testified: "I thought he was keener, if anything. * * * I really got a better impression of his ability than I ever did before. * * * His mind was absolutely clear." Winnie Landes, an employee of the Edwards Company since 1922, saw Edwards in February, 1929, and in July, 1929. In each instance she saw him busying himself with the affairs of the Edwards Company, conferring with employees and salesmen of securities. She testified: "His mental condition was always one hundred per cent in my opinion." J.H. MacKenzie, a wholesale hardware dealer of Portland, who had known Edwards since 1905 when the two played handball together, saw him in February, 1929. Edwards spoke of his interest in his employees and of his satisfaction with the manner in which the Edwards Company was being conducted. The witness observed no mental impairment and declared: "If he had been I would have noticed it because he talked very rationally to me." Eugene Martin, owner of a San Diego automobile agency, had an extended conversation with Edwards in March, 1929, concerning the rebuilding of Edwards' automobile. He declared, "if he was crazy, I would like to be crazy like he was," and then commented upon Edwards' keen mind. Homer D. Peabody, an employee of a securities company, met Edwards a number of times in 1929. He found him a very interesting *Page 620 
conversationalist and well informed in regard to investments. He testified: "His reasoning was very sound." After having testified that Edwards had refused to purchase stocks in 1929 because they were too high-priced, he declared that he regretted that he had not followed Edwards' example. After indicating that Edwards, therefore, saw the severe deflation that began about the middle of 1929, the witness testified: "I think he was a wiser bird than most of us thought he was." Robert Pelouze, a Portland dealer in securities, talked to Edwards in February and in June, 1929, without discovering any evidence of mental impairment. Paul A. Scott, an employee of the Edwards Company, testified that upon Edwards' visit to Portland in February, 1929, Edwards busied himself with an examination of the books. He saw no evidence of mental impairment. William George Sherfese, a San Diego automobile salesman, discussed with Edwards May, 1929, the sale of an automobile. He declared: "I thought he was very capable; he seemed to know exactly what he wanted." George H. Stafford, a member of the Elks lodge of San Diego, like several of the other witnesses, described Edwards' card playing ability. One of Edwards' favorite games was panguingi, which is played with eight decks of cards and requires acute concentration. These witnesses, like all of the others who had played with Edwards, described him as a very capable and successful card player. His ability in card playing did not diminish in the year 1929. Paul Steinmetz, a Portland merchant, talked with Edwards in February and in June, 1929, and noticed no mental impairment. Lee C. Stidd, manager of a Portland Savings and Loan Association, had known Edwards since 1918. In February, 1929, he twice discussed some business matters with him and *Page 621 
found his mind as clear and strong as at any previous time. "He was just as positive, just as sure of himself" as ever. Robert H. Strong, head of a Portland trust company, and who had known Edwards for more than a score of years, had an extended discussion with him in February, 1929, concerning the operation of trusts. He found Edwards' mind as alert and capable as ever before. Elwood Wiles, a real estate dealer of Portland, who had known Edwards for 25 years, discussed with him in February, 1929, the sale of Edwards' furniture business. He found Edwards "fully capable of taking care of his own business" and no evidence of a change in his mental make-up. John Oliver Wyatt, a San Diego dealer in investments, discussed with Edwards investments in February, 1929, and declared: "It was an education to me to get to talk to Mr. Edwards." He found Edwards' mind clear and shrewd. The testimony of other witnesses could be reviewed to similar effect. Their occupations were various and their opportunities for making observations were as good as those whom we have already mentioned. All of them agreed that Edwards' mind had lost none of its capacity for clear thinking. They all found him an agreeable individual. Many of them were evidently amused when they were asked whether they had observed any indications of a diminishing of Edwards' mental capacity and gave evidence of their astonishment by emphatic replies in the negative. A total of 82 witnesses expressed opinions concerning Edwards' mental condition. Only five opinions were adverse. We have previously indicated their nature and source. We shall not spend further time upon this opinion-evidence. *Page 622 
Edwards' conduct in February of 1929 is enlightening. February 10 to 26, 1929, he journeyed alone from San Diego to Portland, then on to Seattle and back to Portland, and thence to San Diego. In the same month he held numerous conversations and gave five of his friends helpful advice. One of these, a Mr. Davis, inquired concerning a proposed attack upon Davis' mother's will. Edwards advised strongly against such a course of action. In February Edwards wrote several letters, all of which are in the record, and certainly give no evidence of impaired mental capacity. He conferred with business associates concerning real estate, the proposed furniture merger, and the creation of a trust. He played cards both in San Diego and in Portland and impressed the other players with his ability. He recognized old friends upon the streets and gave none of them any impression of impaired mental vigor. He spoke to his Portland managers concerning the conduct of his store, suggesting an increase in pay for a faithful employee. February 1, he wrote a letter, well composed, thanking Mr. Sieberts for the excellent volume of business in the past year, and enclosed his check for $1,000 as a token of appreciation. In the same month he checked the records of the Edwards Company, called attention to an instance of poor salesmanship, wrote an article for The Cooperator, the house organ of the Edwards Company, discussed the threat of chain stores, inquired concerning a law suit then pending, and conferred with his Portland managers concerning a reduction in the capital investment of the Edwards Company. In the same month he conferred with some stock and bond salesmen, made an inventory of the contents of his Portland vault, bought some securities and arranged for their *Page 623 
delivery to him in Portland without expense. He also made several entries in his private books of account, showing expenses of operation and cost to himself of securities. In the same month he ordered delivery of a radio receiving set in his Portland apartment, called upon Dr. Forbes of Seattle for medical advice, learned from Mr. Patton, the San Diego nurse, how to take care of himself while upon his trip north, had a tailor make for him a suit of clothes, and checked over the records of one of the employees of the Edwards Company who was keeping Edwards' private set of books. While all of Edwards' books, writings and other entries are a part of the records in this proceeding, nowhere has there been discovered a single error or a notation indicating lack of mental capacity or of poise.
We come now to February 21, 1929. Upon that day, pursuant to appointment, Edwards entered the office of Bessie F. Colwell, a public stenographer, and proceeded to prepare the will which is now under attack. He brought with him a previous will and indicated to Mrs. Colwell the parts of that instrument which he desired to incorporate into the new one. The parts retained were approximately one-half and were items scattered throughout the instrument. The balance he dictated from a few notes which he had in his possession. After his dictation had been completed he made his trip to Seattle where he visited at the home of Mary E. Longo, his sister, for a few hours less than two days. During that visit he also called upon Dr. Forbes whom we have previously mentioned. At the conclusion of the visit he returned to Portland and again called upon Mrs. Colwell. After spending an hour carefully reading the instrument as she had typed it he signed it without making any alterations in it *Page 624 
whatever. The mental ability required to dictate such a complicated instrument is such that we now set forth a copy of the will as an indication of Edwards' mental capacity, February 21, 1929:
 LAST WILL AND TESTAMENT OF THOMAS HENRY EDWARDS
I, Thomas Henry Edwards, of the City of Portland, County of Multnomah, State of Oregon, being of sound and disposing mind and memory, and not acting under duress, menace, fraud or undue influence of any person whomsoever, do make, publish and declare this my Last Will and Testament, and I do hereby expressly revoke all other and former Wills and Codicils to Wills made by me.
 ARTICLE I.
I direct my executors hereinafter named to pay all my just debts and obligations, including the expenses of my last sickness, as soon after my decease as is practicable.
 ARTICLE II.
I do hereby give, devise and bequeath to Laura V. Edwards and Martha Virginia Edwards and to each of them the sum of One Hundred Dollars ($100.00).
 ARTICLE III.
I do hereby give, devise and bequeath to Frances E. Murray, of San Diego, California, one Packard Coupe and such personal belongings as I may have in my apartment in San Diego, including radio, watch, etc.
 ARTICLE IV.
I do hereby give, devise and bequeath to the Security Savings 
Trust Company of Portland, Oregon, a corporation duly organized under the laws of the State of Oregon, and to its successors and assigns (subject *Page 625 
nevertheless to the provisions and conditions hereinafter set out), all of the rest, residue and remainder of my estate, real, personal and mixed, wheresoever situate, of which I may die seized or possessed or to which I may be entitled at the time of my decease in trust, nevertheless, to and for the uses and purposes hereinafter specified as follows, to-wit:
All of the trust estate funds created by this Article of my Will shall be paid and delivered by my said executors as soon as practicable after my decease to the said Security Savings Trust Company, as Trustee, to be managed, invested and finally distributed for the benefit of the beneficiaries hereinafter named, who will share in the income, residue and remainder as hereinafter provided.
The said Trust Company, as trustee, shall keep the said trust fund safely and securely invested, and said trustee shall be the sole and final judge as to the character of securities it may select for investing the funds of the estate, excepting as hereinafter provided, and is hereby released from any statutory restrictions as to the character of its investments in this case.
Said trustee shall have power and authority to sell any of the real and personal property held in trust under this Will, either at public or private sale, with or without notice and without any order of sale and without confirmation of any Court, and upon such terms as it may in its discretion deem advisable.
 ARTICLE V.
The Trustee shall be bound to observe the following instructions in handling this estate.
(a) It must not invest more than five per cent (5 per cent) of the capital of the trust fund in any single investment and in stocks and/or bonds of any corporation or company.
(b) The Trustee shall diversify the investment of funds as is customary with careful and experienced investors. *Page 626 
(c) The Trustee may not invest any of these funds in any security issued by a corporation which may be a debtor to said trustee. The trustee shall not invest any of this trust money in any securities which it may issue or from which it may derive any benefit.
It is my wish and advice that the trustee operate and continue the furniture business of Edwards Company for a period of at least ten (10) years or as long as Mr. Adolph G. Sieberts' services shall be available to manage it. However, if said Sieberts finds conditions unfavorable and if he cannot earn and pay an annual average of six (6) per cent on the investment, to the trustee, then the business shall be closed out and the capital otherwise invested. My experience with said Sieberts has been that he is an honest and competent manager. If at any time he shall advise the trustee to close out the business the trustee shall agree with him and allow him to dispose of it on terms and in such manner as the trustee may approve, but the trustee shall not order the sale of the business on terms or in any manner that said Sieberts does not approve of. In the event of Sieberts' withdrawal the trustee shall liquidate the company within two years. The trustee shall collect the income from the investment and shall make payment to the beneficiaries hereinafter named in amount annually of not less than five (5) per cent of the appraised value of this estate. These payments shall be made quarterly.
It shall keep books of account showing all transactions relating to the trust funds under this Will and shall furnish each beneficiary (interest in any trust) annually a statement of the affairs of the estate, showing the results of its management, securities on hand, purchases, sales and profits or loss during the period.
The object of this Will is primarily to create and maintain a periodical income to the individual beneficiaries and the trusts created by this Will for individual beneficiaries are made for the purpose of providing a suitable support and maintenance for such respective individual beneficiaries, and such beneficiaries shall have no power to anticipate or assign the *Page 627 
income which shall be payable to them respectively under the provisions of this Will, and such income shall not be liable to be taken away from any such beneficiary by process of law or otherwise.
 ARTICLE VI.
To the beneficiaries I give and bequeath as follows:
I direct my trustee to pay to the Sisters of Mercy of Oregon, for the use and benefit of Mount St. Joseph's Home for the Aged, located at East 30th and East Stark Streets, Portland, Oregon, one-twentieth (1/20) of the net income of my trust estate, to be paid to it by my trustee as hereinbefore provided, until final termination of this trust.
I direct my trustee to pay to the Sisters of the Holy Name of Jesus and Mary, for the use and benefit of Christie Orphans Home, located at Oswego, Oregon, one-twentieth (1/20) of the net income of my trust estate, to be paid to it by my trustee as hereinbefore provided until final termination of this trust.
I direct my trustee to pay to Albert H. Herndobler, of Portland, Oregon, two-twentieths (2/20) of the net income of my trust estate for the term of his life, and upon his death, the said two-twentieths (2/20) of the net income of my trust estate, I direct my trustee to pay to his wife for her natural life, if she survive him, and upon the death of both Albert H. Herndobler and his wife, I direct my trustee to pay two-twentieths (2/20) of the net income of my trust estate unto such of their children and the survivor of them as were born before January 1, 1928, equally for their natural life.
I direct my trustee to pay to Adolph G. Sieberts, of Portland, Oregon, five-twentieths (5/20) of the net income of my trust estate for the term of his life, and upon his death, the said five-twentieths (5/20) of the net income of my trust estate, I direct my trustee to pay to his wife, for her natural life, if she survive him, and upon the death of both Adolph G. Sieberts and his wife, I direct my trustee to pay five-twentieths (5/20) of the net income of my trust estate unto such of *Page 628 
their children and the survivor of them as were born before January 1, 1928, equally for their natural life.
I direct my trustee to pay to my sister, Mary Edwards Longo, five-twentieths (5/20) of the net income of my trust estate for the term of her life. To Ann Elizabeth Whiting, my niece, for the term of her life, in case she should survive Mary Edwards Longo, her mother, five-twentieths (5/20) of the net income of my trust estate from and after the death of her mother, Mary Edwards Longo. In case Ann Elizabeth Whiting should die before the closing of this trust and should leave heirs of her body, the five-twentieths of the net income of my trust estate which she would have taken if she had survived my sister, Mary Edwards Longo, I direct my trustee to pay to the heirs of her body and the survivor of them from the date of her death until the termination of this trust, equally and share and share alike. In case Ann Elizabeth Whiting should not survive Mary Edwards Longo and should not leave heirs of her body, then said five-twentieths (5/20) of my net income shall revert to my trust estate.
I give and bequeath unto Lauretta C. Schultz, one-twentieth (1/20) of the income of my trust estate for the term of her life.
I give and bequeath unto Elaine Hamblin, one-twentieth (1/20) of the income of my trust estate until such time as she married, when this bequest shall cease.
I give and bequeath unto Frances E. Murray, of San Diego, California, one-twentieth (1/20) of the net income of my trust estate until she marries, when this bequest shall cease.
I give and bequeath to Sanford Whiting, Jr., son of the late husband of my sister, one-twentieth (1/20) of the net income of my estate for the period of his life.
I give and bequeath to Winnie Landis, bookkeeper for Edwards Company, one-twentieth (1/20) of the net income of my trust estate for the period of her natural life, but only as long as she remains unmarried. *Page 629 
I give and bequeath to William Tilke, Truck Driver for Edwards Company, one-fortieth (1/40) of the net income of my trust estate for the period of his life.
I give and bequeath to James Day, Finisher for Edwards Company, one-fortieth (1/40) of the net income of my trust estate for the period of his life.
I direct that the inheritance tax becoming payable to the United States and/or any State on account of any bequest herein made shall be paid by my executors or my trustee and the amount so paid deducted from the amount of each bequest herein made.
It shall be optional with the trustee to allow the repayment to the estate for tax money over a reasonable period, charging interest against the advance, so that the beneficiary may not be called on to pay a larger lump sum than is convenient or available.
Upon the death or disqualification of any beneficiary, leaving unappropriated a portion of the income, the amount payable to each of the others shall be increased. The shares of the remaining beneficiaries shall be determined by dividing the unappropriated sum into a number of parts equal to the added total of the numerators of the fractional parts of those remaining living. Then each shall receive as many parts of the unappropriated income as is designated by the numerators of his or her fractional share of the original distribution. Example: If Frances E. Murray dies first, then one-twentieth (1/20) of the income will be unappropriated. This amount shall be divided into nineteen (19) parts of which Mary Edwards Longo will receive five (5) parts, A.E. Sieberts five (5) parts, etc.
 ARTICLE VII.
Upon final termination of this trust, I give, bequeath and devise as follows:
I give, bequeath and devise to the Sisters of Mercy, for the use and benefit of Mount St. Joseph's Home for the Aged, five (5) per cent of the residue and remainder of my trust estate to be held by it absolutely and forever. *Page 630 
I give, bequeath and devise to the Sisters of the Holy Name of Jesus and Mary for the use and benefit of Christie Orphans Home, five per cent of the residue of my trust estate to be held by it absolutely and forever.
I give, devise and bequeath unto the heirs and/or devisees of Ann Elizabeth Whiting, the whole residue of my trust estate at the final termination of this trust, to be held by them absolutely and forever.
 ARTICLE VIII.
I hereby nominate and appoint Adolph G. Sieberts and Albert H. Herndobler to be executors of this my Last Will and Testament and hereby direct that each be required to furnish a bond as such in the sum of Ten Thousand Dollars ($10,000.00).
 ARTICLE IX.
Inasmuch as I have made a bequest to each of said executors, no executors' fees shall be allowed to them, said bequests being in lieu of said executors' fees.
 ARTICLE X.
I hereby direct, and it is my wish, that no bond or undertaking be required of my trustee upon qualifying as such, or at any time during the administration of my estate.
 ARTICLE XI.
This trust and Trusteeship shall continue until the death of the last survivor of the following named individuals: Frances E. Murray, Mary Edwards Longo, Ann Elizabeth Whiting, Lauretta C. Schultz, Elaine Hamblin, Albert H. Herndobler and his wife, and the heirs of her body born prior to January 1, 1928, and Adolph G. Sieberts and his wife, and the heirs of her body as were born prior to January 1, 1928, at which time this trust shall cease and determine and the entire trust estate shall be conveyed, transferred and delivered and distributed by my said trustee as in this my Will provided. *Page 631 
 ARTICLE XII.
The funds of this trust shall be ultimately invested in stocks and bonds. A minimum of thirty (30) per cent and not more than forty (40) per cent of said capital shall be invested in bonds, and the balance in common stocks and/or preferred stock, but not more than ten (10) per cent at any time in preferred stock.
In choosing stocks it shall be the purpose of the trustee to enable this estate to share in the future growth and prosperity of the country by making it a point to share ownership in the great representative industries of the country. To this end I hope that the trustee will select stock of the corporations which are dominant or representative of their line of endeavor and whose previous record and progress indicates sound and far-sighted management. The trustee shall keep in mind the fact that no individual stock or bond is an investment and that safety can be obtained only by following the rules of insurance which I summarize as follows:
 Insurance inspects every risk offered — accepts only good risks.
 Examines accepted risks regularly, eliminating the poor ones.
 Takes only small stakes in many risks, widely distributed.
 Owns only bonds and stocks of leading companies in sound and essential industries.
 Except for bank and insurance stock owns only stocks represented on one of the larger exchanges.
 Owns only stock which can boast an unbroken earning, as well as dividend record for at least ten years.
Owns stock in at least five different industries.
 Owns stock in fairly equal amount in at least fifteen different companies.
 Owns a few low yield stocks in future companies as means of building up capital and future income. *Page 632 
 ARTICLE XIII.
In the event that the trustee shall be unsuccessful in the management of the estate to the extent that the capital shall have been lost in unfortunate investment to the extent of more than ten (10) per cent, it is my desire that the beneficiaries holding as much as fifty (50) per cent interest in the income provided may appeal to a court having jurisdiction for it to change the trustee, or the trustee and beneficiaries may agree among themselves to transfer the trust to a thoroughly responsible company with ample capital.
Furthermore, in the event the trustee corporation be absorbed by some other corporation and the beneficiaries do not approve of the new trustee, the right is reserved to the beneficiaries, if seventy-five (75) per cent of them will agree among themselves, to transfer the trust to some other competent and satisfactory trustee.
IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal at the City of Portland, in Multnomah County, State of Oregon, this 21st day of Feby., 1929.
 (Signed) THOMAS H. EDWARDS (SEAL) (Signed) THOMAS HENRY EDWARDS (SEAL)
Without commenting further, we express our opinion that on February 21, 1929, Edwards' mind was not impaired in its testamentary capacity. But the contestant urges that in 1928 and 1929 he was subject to delusions concerning her. We have read the numerous letters which she and he exchanged, and also the extensive recitals in the transcript of evidence wherein the witnesses described the relationship between father and daughter. Edwards never employed any language revealing animosity nor bitterness toward his daughter. He never once showed flightiness nor any other mental condition commonly associated with delusions. He was always considerate, coherent and *Page 633 
logical. Very likely he was lonesome and disappointed. He had found it necessary at times to employ a man with whom to play tennis and a woman to serve him as companion, whereas his daughter, upon whom he had conferred a splendid education, including musical training, remained at the opposite extremity of the country. It is clear that he had hoped for a different situation. He had expressed a hope for grandchildren. He had also spoken to Virginia about residing in some place nearby, and had presented her with an automobile in 1927, apparently in the expectation that she would do so, and thus could come to him from time to time. He had written several letters to Virginia suggesting that she marry a man of proven worth and pointing out how to choose a man of that kind. Instead of marrying a man who had succeeded in establishing himself she married a student. The manner in which the marriage was consummated must have impressed Edwards that his wishes were not consulted and that the decision was a hasty one. Since marriage Virginia's letters to the father became fewer in number. Surely many parents would have displayed disappointment at such a development. No reaction indicated by Edwards' conduct can be classified as a delusion unless it was not founded upon a substantial fact. Since we are not aware of any mental process which Edwards underwent concerning the marriage which was not founded upon some fact, we conclude that he was not subject to delusions.
Let us now turn to the problem whether the will was the result of undue influence exerted by Mrs. Longo and Adolph Sieberts. The contestant's contention is that both of these individuals took advantage of Edwards and thus became beneficiaries of the will, to the exclusion of Virginia. Mrs. Longo was provided *Page 634 
for in wills executed by Edwards in 1924, February, 1926, September, 1926, and September, 1927. All of these bequests in her favor were in substantial amounts. Sieberts was given bequests in the wills of October, 1921, January, 1922, December, 1922, November, 1924, and September 16, 1927. He was also nominated in two of the wills as one of two executors of the estate. No contention has been advanced that Mrs. Longo or Mr. Sieberts won these provisions by any improper conduct. Mrs. Longo's daughter, Ann Elizabeth Whiting, a child of tender years, had also been mentioned by Edwards in previous wills. Employees of Edwards' store were frequently mentioned in earlier wills of Edwards. One of his favorite ideas was to bequeath the stock to the employees upon condition that they pay prescribed sums of money over a period of years into a trust fund. In this manner he had hoped not only to establish a trust fund for his beneficiaries but also to benefit the employees by enabling them to purchase the store at less than its real value. Indicating the lack of any adequate opportunity for the exercise of improper influence by Mrs. Longo upon her brother is the circumstance that she had not been in the same city with him for approximately six months. Her home was in Seattle and Edwards resided in San Diego. Upon the other hand, Virginia had visited with her father in San Diego two months before he executed this will. Mrs. Longo, for a score of years, had displayed a wholesome, affectionate interest in Virginia. It is now the contention of the contestant and her mother that this interest was a sham resorted to for the purpose of impressing Mr. Edwards, who, as we have seen, was very fond of his daughter. It is difficult for us to believe that any individual would resort to such treachery. Especially do we find it *Page 635 
difficult to subscribe to this contention when we take note of the circumstances which we shall now mention. Mrs. Longo had suggested to Mr. Edwards that he should not send Virginia east to secure an education for fear that she might marry in the east and he would thereby lose her. Having heard of the impending marriage, she invited Virginia to be married in her home, an invitation which she would have been most unlikely to extend if she had sought to cultivate her brother's good will. When Edwards refused to send Virginia a wedding present because she had not yet established a home, Mrs. Longo finally succeeded in persuading him to do so. When Mrs. Longo gained the impression that Edwards contemplated matrimony with Mrs. Murray, she recommended that he do so if it would increase his happiness. Had Mrs. Longo merely sought to improve her chances of gaining her brother's fortune she certainly would have opposed his taking a new wife. In the latter part of 1928 Mrs. Longo urged Virginia to visit her father, under the belief that he was then ill and contemplated an operation. If Mrs. Longo desired to create ill will between father and daughter she certainly would not have given that urgent advice. Virginia admits that the visit which she made to her father was prompted by Mrs. Longo's urgent letter.
The contention that Mrs. Longo poisoned her brother's mind against Virginia is based largely upon the testimony of Mrs. Murray, who claims that she read letters which Mr. Edwards received from Mrs. Longo after Virginia had announced her intention to marry Mr. Earle. She testified that in these letters Mrs. Longo declared that Virginia should have waited a year before entering into this marriage, should have *Page 636 
spent a year with her father, and that she displayed a lack of proper affection for him. The record contains at least one item of testimony which strongly suggests that before these alleged letters were written Edwards had already expressed disappointment at Virginia's proposed marriage to the student, Earle. The relationship between Edwards and Mrs. Longo was none other than that which one would expect between a brother and sister. There were periods in which Edwards was sorely displeased with his sister, and at no time did he display any unusual confidence in her judgment. His gifts to her were exceptionally few and of minor consequence. He charged her for the items of furniture which she bought at his store, and added interest upon her overdue account. Upon one occasion she borrowed $500 from him and when it was repaid he exacted interest. There is no evidence which indicates that Mrs. Longo was aware that Edwards contemplated the preparation of a will in 1928 or 1929. After having carefully examined these portions of the evidence, we have not been brought to any conviction that Mrs. Longo was guilty of the charges laid against her.
We come now to the question whether Mr. Sieberts obtained his bequest through the exercise of undue influence. This problem is one which we find easy of solution. Edwards displayed an unusually friendly interest in his employees. He was constantly endeavoring to benefit their condition and to reward them for faithful service. At times he employed a bonus system which at one time caused him to distribute among his employees one-third of his net profits. He also had devised methods by which the employees could purchase stock of the Edwards Company and pay for it largely with the net profits earned by the stock. He *Page 637 
helped his employees with their dues in athletic clubs and to attend lectures on salesmanship. After he began in the year 1922 to spend much of his time in California, his expressions of appreciation for the loyalty of his employees increased in number. He rewarded Mr. Herndobler, vice president of the Edwards Company, and one of the beneficiaries under his will, with several substantial checks as rewards for his efforts to prosper the Edwards Company. To other employees he was also generous. In one of his letters to Sieberts he declared: "I will tell the world that if it wasn't for the people who are working in that business I would wind it up and become a resident of California within the year, but you may rest assured that I have no intention of so doing as long as you can make interest on the investment and pay yourselves enough to make it worth your while for the work." October 23, 1928, Edwards wrote to Sieberts the following letter:
"Dear Ade:
When I come up next week, I want to talk over with you boys the subject of my estate, and so forth — so I am saying something about it in advance, that you may have time to think, and if possible, be of some help on this most complicated subject.
It is said that reading makes a full man, speaking makes a ready man, and writing makes an exact man. `Write it down' is one of the rules of correct thinking. So, on a subject which causes many men to shy off and leave their estates in a mess, I prefer to study with you how best to put my affairs in good order, and not cause the entire economic waste usual in a change of ownership.
I have pretty well settled in my mind who are to be the beneficiaries. Just what share each shall have, I may change from time to time. The subject of how the *Page 638 
estate shall be administered, so as to get the most return from the capital, and thereby doing the most good to the beneficiaries, is most complicated. For instance: `Is it advisable to try to run the business after my death? If so, under what restrictions? And then we come to the problem if and when you pass out of the picture. Your end is just as sure as mine; it is a contingency to be provided for. If we are to liquidate on my decease, how shall the trustee be instructed on the subject of investments? Will it be more profitable, safer, or better business to liquidate in one or two years?'
The question I am going to put to you and Herndobler, and maybe to some others is:
`What would you do if you were in my place? How would you leave things, and why?'
Unless first-class plans are laid, the lawyers, tax collectors and others will reap a rich reward. If we can plan ahead, it may take us some time, but there is a great satisfaction in fooling the tax people if we can do it under the law.
It is a great satisfaction that I am able now to establish the trust for Virginia at what I estimate to be a saving of ten to twenty thousand dollars in taxes, fees, and so forth.
These things must be worked out, so that they do not come under the rule `Done in anticipation of death.'
The United States revenue taxes you have been up against, but all of the different death grafts no one can know. However, I would like to try and beat some of them.
When a family works for two generations on an estate, is that estate not a worth-while subject for thought? What is going to happen to it?
 Very sincerely, T.H.E." *Page 639 
November 6, 1928, he sent to Mr. Sieberts another letter from which we copy the following parts:
"Dear Ade:
While I am alive, I do not particularly need the income from the capital invested in the business; but when I am gone, the beneficiaries will need and expect what I devise to them, — that is income.
This income, as I have defined it, is to be a sum annually, not less than five per cent of the value of the personal property, less taxes, which shall come into the hands of the trustee.
The estate, at present writing, would inventory something like this:
 Negotiable securities ___________ $125,000 Real estate _____________________ 35,000 Stock of Edwards Company ________ 300,000 A total of ___________________ 460,000
The taxes, I estimate, including expenses of other settlements * * *
I just looked up the Oregon tax schedule on an estate of $500,000, left to a child or near relative — the tax is $17,525. The tax on the same estate, if left to a non-relative is $138,125; so you see that the laws of the state of Oregon do not favor a man who wants to do anything for his employees. * * * The reason I am writing in this rambling way is that it helps me to think, and the more I think, the more mixed up I get. But someone must do a lot of thinking on this subject, and that is me. * * *"
The above, as well as other letters which followed, indicated clearly that Edwards was endeavoring to determine how his furniture store could be continued after his death with competent management and without the uncertainty usually attendant upon the probating of estates. It developed that he also was determined to draw $200,000 out of the working capital of the Edwards Company. These are the problems upon which he sought help. Sieberts, in letters, expressed *Page 640 
willingness to help but received a reply that the problem was too difficult for his solution and that he should give over his full thought to the Edwards Company. Later, Sieberts, with the assistance of Mr. B.B. Coles, one of the officials of the Security Savings Trust Company, prepared a series of suggestions for continuing the Edwards Company. One of these suggestions contemplated the purchase of the store by Sieberts upon a deferred payment plan. Sieberts did not like the idea of reducing the capital investment of the company. The reply which he received indicates forcefully how little influence Sieberts possessed with Edwards. We quote a portion of it:
"My idea is to have you continue the business on a smaller scale, and I do not see what B.B. Coles knows about reducing a business. * * * Make up your mind that I am going to draw out as much as I can up to $200,000 under a plan that you may make or I will make myself. * * * I cannot see any merit in any plan to sell you or anybody else unless they can show me where the money is coming from to release some of the capital. * * * As you cannot pay even the interest or any part of it for the last two years, as things are, how could you expect to purchase the business. If you have anything on your chest ask me about it and I will put you straight."
The letters which passed between the two men indicate very clearly that Edwards knew his mind and that Sieberts, and not Edwards, was the party that was influenced. We find no evidence whatever in the record indicating that Sieberts in any manner influenced the will.
Finally, it is argued that the will is an unnatural one. Had this will been written in 1926 this argument would possess more merit. In that year the trust fund had not yet been established. This fund assured Virginia *Page 641 
of an income of at least $100 a month and granted her testamentary disposition of over $90,000 of high grade stocks and bonds. Had the $90,000 bequest been inserted in the will scarcely anyone would suggest that Virginia had been disinherited. Yet the trust fund was in operation prior to Edwards' death and freed the bequest of probate expenses and delays. Moreover, in 1926 the relationship between Virginia and her father underwent a severe strain. She championed the cause of her mother in the pending trust fund controversy, and thereby at times greatly irritated her father who never loved opposition. Virginia was so fearful of the consequences that might follow these unhappy occurrences that she altered her course of study at Wellesley College so as to equip herself to earn a livelihood. Her marriage, likewise, as we have seen, was a severe disappointment to him. Just before Edwards prepared the 1929 will the trust fund became operative and this contained a substantial provision for Virginia. Edwards on several occasions expressed satisfaction with his act in providing for Virginia. To Mrs. Colwell, the stenographer to whom he dictated his will, he explained, "I made a settlement on my wife and daughter at the time of the separation." He seemed to believe that in that manner he had avoided probate and tax expense items.
Edwards' interests in life had been exceptionally few. His home life and his marriage had given him scant pleasure. Very likely the fault was his. He moved about in a small circle. His intimate friends were few in number. His wealth and the problems associated with it concerned him much. Into this somewhat drab existence came Virginia. She was the only bright influence which had ever brought him real *Page 642 
joy and happiness. Then came the unfortunate disappointment of 1928. To a life which was lonely came that great shock.
In the light of the circumstances reviewed above, it seems to us that the will was not unnatural.
Seven months after the will was executed Edwards died. In those seven months he frequently mentioned his will, discussed the operation of trusts, and had a copy of the will in his San Diego apartment. These circumstances add strength to our conviction that the document he left expressed his real will.
The principles of law applicable to this situation are so simple that we have refrained from discussing them. We are convinced that Edwards possessed testamentary capacity, and that the will was the product of his choice, uninfluenced by fraud or other improper conduct.
It follows that the orders and decree of the circuit court are affirmed.
BELT and KELLY, JJ., concur.
CAMPBELL, J., not sitting.
FAVORING REVERSAL OF DECREE.